DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * *
John Doe and Jane Doe *
*
v. * C.A. No. 04-375L
*
Chariho School District *
*
* * * * * * * * * * * * * * * * * * * *

OBJECTION TO REPORT AND RECOMMENDATION
OF MAGISTRATE JUDGE

Now comes the defendant, Chariho Regional School District, and objects to the Report and Recommendation issued by the United States Magistrate Judge in this matter on May 27, 2005. The defendant cites as the specific grounds for its objection the following points critical to the Report and Recommendation:

1. **Change in the "Then-Current Educational Placement."** The Report and Recommendation incorrectly interprets and applies the term "then-current educational placement" as set forth in 20 U.S.C. §1415(j). This provision in the statute, commonly referred to as the "stay-put" provision, is designed to preserve the status quo during IDEA challenges to prevent the disruption of a child's education while disputes are litigated. In determining that a change in John Doe's school from the independent South Shore School to the RYSE School at Chariho would constitute a "change in the then-current educational placement" of John Doe, the Magistrate Judge adopted the approach of the administrative hearing officer in suggesting that there exist "significant differences" between the two locations. (This finding was also made by the District Court--without the benefit of having reviewed the administrative record--at the time

the motion for order pendente lite was considered.) The evidentiary record, however, when fully reviewed, does not demonstrate the existence of *educationally* "significant differences" between the two schools.

The conceptual underpinnings of the cases cited by Chariho, indicating that "educational placement" as used in IDEA means educational program--not the particular institution where that program is implemented, were deemed to be "factually inapposite" in the Report and Recommendation (pages 7-8) because they all involved "intra-district transfers." The guiding statutory concept embraced by these cases, however, is not diminished by the fact that they involved intra-district transfers from one school building to another within a school district. The elemental concept is that a change in "educational placement" occurs only when there is a "fundamental change in, or elimination of a basic element of the educational program." Knight v. District of Columbia, 877 F.2d 1025 (D.C. Cir. 1989). Each of the cases cited by Chariho in its Memorandum in Support of Summary Judgment stand effectively for this same proposition: A. W. v. Fairfax County School Board, 372 F.3d 674 (4th Cir. 2004); Ex Rel. White v. Ascension Parish School Board, 343 F.3d 373, (5th Cir. 2003).

Further, the Report and Recommendation's reference to the unreported case decided by Chief Judge Torres in 2003, T. B. v. Warwick School Department, No. 01-122T, 2003 WL 22069432 (D.R.I., June 6, 2003), dealing with "educational placement," is misplaced. Chief Judge Torres concluded that, because the student in T. B. was transferring from one state to another, that the prior state's educational placement decision did not automatically continue in effect in Rhode Island. In the instant case involving John Doe, the student has continually remained within the educational purview and responsibility of the Chariho Regional School District.

Chariho certainly acknowledges that any change of a student's school building would necessarily entail some elements of change in educational environment. The determinative question under §1415(j) is not whether there is *any* change in educational environment, however. "Placement" does not refer to location; it refers to educational "program," and the "continuum" of placements (from regular education classroom at one end of the spectrum to full-time residential facility or hospital at the other). As it pertains to a determination under IDEA, a change in "educational placement" occurs only when there is a fundamental change in or an elimination of a basic element of the educational program set out in the student's IEP. Knight v. District of Columbia, 877 F.2d 1025 (D.C. Cir. 1989).

The Report and Recommendation incorrectly adopts the hearing officer's conclusion that John Doe's "educational experience would differ and the proposed transfer [from one school to the other] would significantly affect his learning" (Report and Recommendation, Page 9), as there is no evidence in the administrative record below which establishes any substantial or material difference between the two schools or any difference of a substantive or material nature regarding the educational program which would be afforded to John at either school location. Both schools fall at the same point along the special education continuum as a "clinical day school." Both schools are physically separated and "stand alone." (The independent South Shore School is located in a small shopping center in Wakefield, Rhode Island, while the RYSE School is housed in a separate building located on the Chariho school campus in Richmond, Rhode Island.) In either location John would interact on a daily basis only with the students and professionals in his small classroom (6 to 10 students). The educational program which would be provided to John in each of these environments is identical, as mandated by his IEP. Other than the fact that John had expressed anxiety and fear about "returning to Chariho," there is nothing in

the record to explain the hearing officer's conclusion that John would experience a materially or substantially different educational environment if he were to attend the RYSE School at Chariho. John's fears and anxieties were not discounted or dismissed in Chariho's recommendation that his IEP could be implemented at the RYSE School, as suggested by the Report and Recommendation. Indeed, those emotions, and John's understandable desire to remain at South Shore School were anticipated and taken into properly taken into consideration by the RYSE School staff and the experts who testified at the administrative hearing, all of whom indicated that they were able to provide John with a program and an environment in the RYSE School where he could reasonably be expected to benefit educationally.

In adopting the decision of the hearing officer that John's educational experience would differ and the that proposed transfer would significantly affect his learning, the Report and Recommendation makes specific reference to comments appearing in the hearing officer's decision at page 11. The hearing officer pointed to four "differences" between the private, independent school and the RYSE School at Chariho as supportive of the conclusion that a transfer between the schools would constitute a change in John's then-current educational placement. First, the hearing officer indicated that the independent school would protect John from all "outside" influences, and that at the RYSE School he would "encounter far more students." This finding, apparently adopted by the Report and Recommendation, is not supported by the evidence. The RYSE School at Chariho, although located on the Chariho campus, is separate and apart from all other school programs, activities and buildings. The students attending the RYSE School do not interact with the other students at Chariho. Rather, they spend their day in the separate clinical day environment in their small classes supported by their special education teachers and the professional clinical staff. The second difference alluded to by the

hearing officer and adopted by the Report and Recommendation is that John's departure from the independent South Shore School would necessitate his leaving a "cocoon-like" atmosphere and require his attendance at the RYSE School which would entail "daily change in his schedule." Again, the evidence adduced at the administrative hearing does not support such a distinction. Attendance at the RYSE School would not involve moving from class to class or daily changes in schedule (as might be expected at a traditional high school, like Chariho High School). Rather, the two RYSE teachers would teach the same students in the same classroom, but in different subjects. The third "difference" referred to by the hearing officer and adopted by the Report and Recommendation entails John's participation in "group therapy" at the South Shore School. Again, there was no evidence presented at the administrative hearing to indicate what the "group therapy" at the South Shore School entailed. There was evidence that at the RYSE School, at the end of each day, the small class (again 6 to 10 students) met together (although not labeled as "group therapy") to "discuss the day" and to explore the significance of the events which occurred during the course of their school day. The fourth and final difference identified by the hearing officer is that John would enjoy the continuity of his relationships with his teacher and clinician at the South Shore School, whereas a transfer to the RYSE School at Chariho would involve "all new teachers and clinicians." Again, this "difference" is without material or substantive distinction as demonstrated by the facts that John's teacher and his clinician changed at least once during the course of his first year at the South Shore School, a significant change in the student makeup of his class at the South Shore School was expected, and the behavior management assistant with whom he had established a relationship at South Shore School had been shown to have actively pursued alternative employment opportunities.

2. **The RYSE School's Substantive Ability to Provide John with a FAPE**. The Report and Recommendation erroneously reverses the hearing officer's conclusion that the IEP proposed by Chariho would provide John Doe with a free, appropriate public education "under the specific and very unique circumstances of his situation." (Report and Recommendation, page 12.) The Report and Recommendation fails to adhere to the principal role of the courts in reviewing an administrative hearing officer's determination of whether or not a public school system has met its obligations under IDEA. The Act requires a school system to provide an IEP which is "reasonably calculated" to provide an "appropriate" education as defined by the federal law. Rome School Committee v. Mrs. B., 247 F.3d 29 (1st Cir. 2001). The hearing officer below, having had the opportunity to receive and observe the testimony of all the witnesses first-hand, ultimately concluded that Chariho's RYSE School could implement John Doe's IEP, and that his IEP was "adequate and appropriate for" this "particular child." Burlington v. Department of Educ., 736 F.2d 773 (1st Cir. 1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L. Ed.2d 385 (1985) (Burlington II). FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice or even the best choice. G. D. v. Westmoreland School District, 930 F.2d 942 (1st Cir. 1991). A reviewing court's role has been defined as "involved oversight." Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990). Jurists are not trained, practicing educators, and should give "due weight" to the state agency's decision in order to prevent judges from "imposing their view of the preferable educational methods upon the States. Id., citing Board of Educ. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 3051.

In the instant case, the Magistrate Judge's Report and Recommendation determined that the state hearing officer determination, that Chariho's program at the RYSE School would, in light of all the facts and circumstances, provide John with FAPE, was incorrect. It appears that

the Magistrate Judge's Report and Recommendation focuses on six points to support the conclusion that John's attendance at the RYSE clinical day school at Chariho would not be "appropriate."

First, the Report and Recommendation suggests that implementation of John's IEP at the RYSE School would not fully take into account his prior history and the anxiety and fears which he currently expresses. In support of this, the Report and Recommendation notes that the hearing officer recognized that John felt he had been "bullied and threatened" in his prior brief exposure at Chariho. Although there was no extrinsic evidence presented to support this factual allegation, no one denies that John is a fragile youngster who was frightened by the prospect of leaving the South Shore School and returning to Chariho, albeit now at the RYSE School. Each of Chariho's witnesses who testified on this issue (the RYSE School staff psychiatrist, RYSE's full-time clinical psychologist and the RYSE School director) indicated that they had experienced similar situations with other students who had encountered similarly horrific younger childhoods. Each Chariho witness expressed absolute confidence in their ability to overcome John's expressed anxieties and to deal with them effectively as part of his overall education program at the RYSE School. The comments from John's teachers and counselors at the South Shore School regarding the "change" which would accompany a transfer to Chariho must all be viewed in the light of the fact that none of John's counselors or teachers had any idea about the RYSE School environment or the program at the RYSE School. A fair reading of the transcripts would lead one to conclude that, given their admitted ignorance of the RYSE School, each of the South Shore School witnesses would have envisioned a regular classroom at the Chariho High School or Middle School when they were commenting on what might or might not be in John's best interests. Clearly, it would have been inappropriate to suggest that John should be returned to a large

classroom (or *any* classroom) in the regular education environment at Chariho, even with "pull-out" supports from the special education staff at the high school. This was not the plan for John, however; and it appears to be a principal point of misunderstanding in the Report and Recommendation of the Magistrate Judge. John's prior experience in the "regular classroom" at Chariho was vastly different from that which would be provided for him upon a return to the separate and vastly different surroundings at the RYSE School.

Second, the Report and Recommendation references the hearing officer's comments that the "size of the building and campus" at Chariho could serve as a platform for "teenage abuse and bullying." The Report and Recommendation misconstrues this comment from the hearing officer, however, as it was made in the context of the hearing officer's recommendation that John be allowed to travel on a "small bus" for transportation to and from the RYSE School so that even the brief encounter he might experience with other high school or middle school students at the Chariho campus when he was walking to or from the bus and the RYSE School building would be minimized. The hearing officer correctly understood (having viewed the premises) the small classroom and protected nature of the separate RYSE School building at the Chariho campus, and the effective lack of any "outside influence" from other regular education students at Chariho.

The third point in which the Report and Recommendation misunderstands or misconstrues the evidence of the administrative hearing deals with the importance of "stability" in John's life. Again, the Chariho experts who testified below all expressed a sensitivity to John's need for stability and safety as well as supreme confidence in their ability to provide John with those necessary elements as part of the educational program and supportive services designed for him within the RYSE School. Additionally, the Report and Recommendation fails to take note of

the changes which occurred in John's environment at the South Shore School even during the brief period of his attendance there. Not only did his teacher change, but also his clinical social worker (with whom he had developed a close relationship) changed abruptly when those individuals left the employ of the South Shore School. Further, the evidence indicates that John's class was expected to undergo significant change between academic years (only three of the class's students, including John, were expected to return for the next academic year). Additionally, the Report and Recommendation fails to take note of the continuing difficulties which John demonstrated in his interpersonal relationships with students at the South Shore School, notwithstanding the "stability" offered by that location.

Fourth, the Report and Recommendation places undue reliance upon the holding in Greenbush School Committee v. Mr. and Mrs. K., 949 F.Supp. 934 (D. ME 1996). In Greenbush the court found that there was sufficiently severe hostility existing between the student and the student's parents and school personnel as to render it *impossible* for the student to achieve any educational benefit should the student return to the public school system. There were no such findings of such severe hostility in the instant case. In fact, evidence was presented quite to the contrary, including that of John Doe's psychiatrist, who indicated that, as long as John was to be educated with students with similar needs and in an environment of caring persons, he would recommend: "Why not try it?" The hearing officer obviously accepted the ability, sincerity and sensitivity of the Chariho professionals at the RYSE School in determining that John's fears and anxieties could be overcome and he could be provided a free appropriate public education at the RYSE School, and that the program devised for him at the RYSE School was reasonably calculated to provide him with an educational benefit, in light of all of his circumstances. There was no evidence that would support a determination that the level of hostility and/or anxiety had

reached such a severe point, as the court found in Greenbush, so as to render it impossible for John to achieve an educational benefit by attendance at the RYSE School.

Two final points give rise to Chariho's objection to the Report and Recommendation of the Magistrate Judge. First, the Report and Recommendation makes reference to the "difficulty" the Magistrate Judge found in reconciling "the hearing officer's decision in this case with her decision in the companion case." The companion case, although containing some similar elements to the instant case, presents very different underlying factual circumstances regarding that student's (or that student's family's) subjective fears or anxieties regarding the student's return to Chariho. Chariho believes it was inappropriate for the Report and Recommendation to make reference to the "companion" case, as such case has not yet been reached for decision nor argued by the parties. Each case, and the decision of the hearing officer in each case, must be considered on its own merits.

Finally, Chariho must take issue with and object to the Report and Recommendation's implication that Chariho's decision regarding placement in this matter was dictated by "financial" considerations. Although financial issues in the public education realm are always unavoidably present, Chariho objects to any suggestion that its motivations in recommending John Doe's return to the RYSE School was motivated strictly, or even principally, by financial concerns. Although Chariho is rightfully proud of its innovative and successful independent clinical day school, the decision to recommend John's return to the RYSE School was borne solely out of a firm belief that the RYSE School and its academic and clinical staff can meet John's unique needs as well as, if not better, than the alternative independent school placement. The very purpose underlying IDEA is to educate students with disabilities in an environment, and with supportive services and opportunities, which enable them to enjoy the same educational

opportunities and benefits as those offered to non-disabled students as closely as possible. (Therefore, the "least restrictive environment" requirement of IDEA.) Chariho is acutely aware of John's incredibly difficult childhood and past experiences before he was adopted by Mr. and Mrs. Doe. In the past, before IDEA and its legislative predecessors, public school systems all too frequently relegated students with needs and challenges similar to John's to being "shipped out" to locations where they would not be a "burden" to the public schools. Thankfully, this is no longer acceptable, and in Chariho's and the RYSE School's perspectives, such an archaic approach to children with disabilities is abominable. Any prior reference by counsel in the instant proceedings to the financial commitment made by Chariho in establishing its RYSE School was meant not to suggest the saving of public tax dollars alone, but to underscore the professional and social commitment which the Chariho Regional School District and its community of parents and taxpayers have made to embrace and encourage students like John and to provide them with a meaningful opportunity to succeed -- academically and in life. Chariho's program and its RYSE School are a model for this state and, indeed, the nation. The RYSE School and its professional staff are ideally suited to provide a caring, nurturing and protective environment in which an educational plan devised specifically for John Doe in light of his unique needs can flourish. To suggest that Chariho's decision to recommend John's transfer to its RYSE School was borne out of strictly financial considerations is, quite simply, unfair. Obviously, as a public school system, Chariho must meet its obligation to devise special education programs and supportive services for each student according to his or her unique needs. Chariho has done so in John's case. If Mr. and Mrs. Doe prefer not to avail themselves and their son of the opportunities provided by Chariho, that is certainly their right. All Chariho

asks is that this court acknowledge the limits of its obligations as a public school system under IDEA and to confirm that Chariho has met (or exceeded) those obligations owed to John Doe.

Accordingly, Chariho respectfully urges this Court to review the record in this matter carefully, to reject the Report and Recommendation of the Magistrate-Judge, and to enter its independent judgment finding:

A transfer of John Doe from the South Shore School to the RYSE School, with no change to his IEP, would not constitute a change in his "then-current educational placement" as that phrase is used in 20 U.S.C. 1415(j);

The implementation of John Doe's IEP at the RYSE School maintained by Chariho would provide John with a free, appropriate public education; and

Reversing, in part, and affirming, in part, the hearing officer's decision consistent with the first two findings, above.

Chariho Regional School District
By its attorney,

[signature]

John G. Earle/RI Bar No. 2406
Breslin, Sweeney & Earle, LLP
222 Jefferson Blvd., Suite 300
Warwick, RI 02888
Tel. : 401-737-8484
Fax : 401-738-6935

Certification

I hereby certify that a true copy of the within Objection was mailed by first-class U. S. Mail to counsel for the plaintiffs, H. Jefferson Melish, Esq., 74 Main Street, Wakefield, RI 02879, on the 6th day of June, 2005.

[signature]